**John Burgess, OSB No. 106498**
johnburgess@lawofficeofdanielsnyder.com
**Carl Post, OSB No. 061058**
carlpost@lawofficeofdanielsnyder.com
**LAW OFFICES OF DANIEL SNYDER**
1000 SW Broadway, Suite 2400
Portland, Oregon 97205
Telephone: (503) 241-3617
Facsimile: (503) 241-2249
**Katharine Edwards, OSB No. 173393**
attorney@kedwards-law.com
**LAW OFFICE OF KATHARINE EDWARDS**
P.O. Box 417
Hillsboro, Oregon 97123
Telephone: (503) 908-3589
Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

|  |  |
|---|---|
| ZERA LOLA ZOMBIE, | Case No. 3:21-cv-01338-AA |
| Plaintiff, | |
| v. | **FIRST AMENDED COMPLAINT** |
| STATE OF OREGON, JOSH HIGHBERGER, BRANDON KELLY, ROBERT ADAMSON, TOBY TOOLEY, MALCHOLM BARTH, CLAYTON BORDEN, GARY ALVES, MARTIN WILLIAMS, STEVEN NEWELL, WADE TRYON, WILLIAM SNYDER, C/O PARKER, JAMIE BREYMAN, KAREN RHOADES, ERIN REYES, DUSTIN HERRON, STEVEN BOSTON, THERESA SWART, ATHENA HOLMES, BRYCE KENNEDY, C/O OLSON, CPL. ADAMS, JEFFREY TERRY, BRIAN WASHBURN, ABRAHAM CAMPOS, ADAM ARCHER, C/O DEAN, SGT. ARVALDO, C/O ERICKSON, STEPHEN STEFFEY, | (42 U.S.C. §1983; Negligence; Retaliation; Intentional Infliction of Emotional Distress) |
| | JURY TRIAL DEMANDED |

Page 1 – FIRST AMENDED COMPLAINT

**STEPHEN TROTT, GUNNAR MORBY, ALBERT HAZEN, ALLA MOON, JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, JOHN DOE 4, JOHN DOE 5, JOHN DOE 6, JOHN DOE 7, JOHN DOE 8, JOHN DOE 9, JOHN DOE 10, JOHN DOE 11, JOHN DOE 12,** and **JOHN DOE 13,**

Defendants.

Plaintiff Zera Lola Zombie alleges as follows:

### PRELIMINARY STATEMENT

1. Plaintiff Zera Lola Zombie brings this action under 42 U.S.C. § 1983 against the named defendants' actions for (1) discriminating against Plaintiff on the basis of her gender and gender identity; (2) housing Plaintiff, a female, in a men's prison; (3) failing to follow both federal and Oregon rules and laws concerning the designation and protection of Plaintiff as a "vulnerable" Adult-In-Custody ("AIC") at high risk for both physical and sexual assault; (4) *twice* assigning Plaintiff to share a cell with a known sexual predator, and failing to respond to Plaintiff's complaints of frequent physical and sexual assaults by her cellmates; (5) failing to provide legally-mandated counseling and Prison Rape Elimination Act (PREA) protections; (6) allowing male staff and inmates to observe her naked body in her cell while she is changing or using the bathroom, as well as during cell transfers, strip searches, and urinalysis (UA) collection; (7) failing to follow federal and Oregon laws and rules regarding sexual assault reporting and investigations and thereby subjecting Plaintiff to retaliation and further harm; and (8) retaliating against her for bringing this lawsuit by putting her in a cage where she urinated on herself, forcing her to submit to a body cavity search by a male staff person, and then parading her in front of staff and male inmates in her underwear.

2. Plaintiff is a transgender woman currently in the custody of Oregon Department of Corrections ("ODOC") at Coffee Creek Correctional Facility ("CCCF"). Until September 2,

2021, Plaintiff was housed at Oregon State Penitentiary ("OSP"), and prior to that, Oregon State Correctional Institution ("OSCI"), both men's prisons. Plaintiff's gender is legally recognized as "female" and she is classified in ODOC's records as female.

3.      Plaintiff has suffered ongoing harassment and verbal, mental, and psychological abuse by both prisoners and ODOC staff as a result of her sex, gender, and gender identity. Plaintiff was physically assaulted twice on October 9, 2020, by AIC A.H. because of ODOC/OSP staff's failure to protect her. Plaintiff was assigned to share a cell with AIC M.S., a prisoner known to ODOC to have a history of violent sexual assaults against women and from April 2020 to May 2021, Plaintiff suffered numerous and frequent physical and sexual assaults by M.S., sometimes on a daily basis. Plaintiff alerted ODOC/OSP staff of the abuse on at least two occasions and ODOC/OSP staff failed to protect her. During the course of ODOC's investigation into the sexual assaults, ODOC/OSP staff allowed M.S. to leave disciplinary segregation despite the known threat to Plaintiff. Despite Plaintiff's reports of sexual assault, Defendants failed to provide timely, proper, or confidential counseling as required by PREA.

4.      Plaintiff was later housed with AIC J.L. and subjected to frequent sexual assaults from December 22, 2022, to January 12, 2023. Despite Plaintiff's best attempts at informing staff members of the abuse she was enduring, her pleas were ignored. ODOC/TRCI once again failed to protect and failed to uphold PREA requirements.

5.      Following the entry of a preliminary injunction, defendants retaliated against her by subjecting her to a urinalysis examination by a male officer. When she demanded that it be performed by female staff pursuant to the court's order, she was placed in a small cage where she could not move. She urinated on herself, and then was paraded before staff and inmates in her panties to a room where she underwent a body cavity search by a male guard.

6. Defendants are individuals who, during the time of Plaintiff's incarceration, have had authority and responsibility for her treatment, safety, and care.

7. Plaintiff has fully exhausted her available administrative remedies.

8. Plaintiff seeks equitable relief, compensatory and punitive damages, as well as attorney fees and costs as set forth below.

## JURISDICTION

9. Jurisdiction is conferred upon this Court by 28 U.S.C. §1331, federal question jurisdiction, and pursuant to 28 U.S.C. §1343(a)(3) and (4), civil rights jurisdiction.

10. Venue is in the District of Oregon pursuant to 28 U.S.C. §1391(b) because the claim arose in this Judicial District and all Defendants are employed by ODOC in CCCF, OSP, or OSCI, which are in Washington and Marion Counties, respectively.

## PARTIES

11. Plaintiff is a citizen of the United States. At all times material, Plaintiff was incarcerated in the custody of ODOC and housed at OSP, OSCI and CCCF. Plaintiff is a female person who was previously regarded as being a male person.

12. Defendant State of Oregon operates the Oregon Department of Corrections (ODOC) which owns, staffs, and operates OSCI, OSP, TRCI, and CCCF.

13. Josh Highberger is the Superintendent of OSCI.

14. Brandon Kelly is the Superintendent of OSP.

15. Erin Reyes is the Superintendent of TRCI.

16. Robert Adamson is a Correctional Officer and PREA Coordinator at OSP.

17. Toby Tooley is the PREA Compliance Manager at OSP.

18. Malcholm Barth is a Correctional Officer at OSP.

19. Clayton Borden is a Correctional Officer at OSP.

20. Gary Alves is a Correctional Officer at OSCI.

21. Martin Williams is a Correctional Officer at OSCI.

22. Steven Newell is a Correctional Officer at OSCI.

23. Wade Tryon is a Correctional Officer at OSP.

24. William Snyder is a Correctional Officer at OSP.

25. C/O Parker is a Correctional Officer at OSP.

26. Jamie Breyman is Administrator of the Office of Population Management and head of the Transgender and Intersex Committee.

27. Karen Rhoades in Behavioral Health Services Manager at OSP.

28. Dustin Herron is a Correctional Officer and PREA Coordinator at TRCI.

29. Capt. Steven Boston is a Correctional Captain at TRCI.

30. Theresa Swart is a Correctional Officer at TRCI.

31. Athena Holmes is a Correctional Officer at TRCI.

32. Bryce Kennedy is a Correctional Officer at TRCI.

33. C/O Olson is a Correctional Officer at TRCI.

34. Corporal Adams is a Correctional Corporal at TRCI.

35. Jeffrey Terry is a Correctional Officer at TRCI.

36. Brian Washburn is a Correctional Officer at TRCI.

37. Abraham Campos is a Correctional Officer at TRCI.

38. Adam Archer is a Correctional Officer at TRCI.

39. C/O Dean is a Correctional Officer at TRCI. His first name is believed to be David or Ryan.

40.     Sergeant Arvaldo is a Correctional Officer at TRCI.

41.     C/O Erickson is a female Correctional Officer at TRCI.

42.     Gunnar Morby is a Correctional Officer at TRCI.

43.     Sgt. Stephen Steffey is a Correctional Sergeant at TRCI.

44.     Cpl. Alla Moon is a Correctional Corporal at TRCI.

45.     Capt. Stephen Trott is a Correctional Captain at TRCI.

46.     Lt. Albert Hazen is a Correctional Lieutenant at TRCI.

47.     John Doe is 1 a Correctional Officer at OSCI. The identity of John Doe 1 is not known at this time but as discovery is made available this individual will be identified and substituted for John Doe 1.

48.     John Doe 2 is the individual within ODOC who is responsible for evaluating and screening individuals upon their introduction into the prison system to determine their vulnerability for sexual assault/harassment and to determine the safest and most appropriate housing assignment for them. John Doe 2 was an employee of ODOC and had the duty to assess Plaintiff for vulnerabilities to her safety and appropriate housing assignment at the time of her entry into ODOC. The identity of John Doe 2 is not known at this time but as discovery is made available this individual will be identified and substituted for John Doe 2.

49.     John Doe 3 is the individual working for ODOC/OSP who had a role in assessing Plaintiff's classification and her housing assignments to ensure her protection and safety and to prevent her sexual assault. The identity of John Doe 3 is not known at this time but as discovery is made available this individual will be identified and substituted for John Doe 3.

50.     John Doe is 4 a Correctional Officer at OSP and was the A-Block officer who ignored the physical assaults that occurred against Plaintiff. The identity of John Doe 4 is not

known at this time but as discovery is made available this individual will be identified and substituted for John Doe 4.

51.     John Doe 5 is the individual working for ODOC/TRCI who had a role in assessing Plaintiff's classification and her housing assignments to ensure her protection and safety and to prevent her sexual assault. The identity of John Doe 5 is not known at this time but as discovery is made available this individual will be identified and substituted for John Doe 5.

52.     John Doe is 6 a Correctional Officer at TRCI and was the Medline officer who ignored the physical assault that occurred against Plaintiff. The identity of John Doe 6 is not known at this time but as discovery is made available this individual will be identified and substituted for John Doe 6.

53.     John Doe is 7 a Correctional Officer at TRCI and was the officer who placed Plaintiff into DSU without appropriate medical attention for her head injury. The identity of John Doe 7 is not known at this time but as discovery is made available this individual will be identified and substituted for John Doe 7.

54.     John Doe 8 is a Correctional Officer at TRCI who refused to implement a conflict report for Plaintiff to protect her from her attacker. The identity of John Doe 8 is not known at this time but as discovery is made available this individual will be identified and substituted for John Doe 8.

55.     John Doe 9 is a Correctional Officer at TRCI who placed Plaintiff in a cage and told she would need to submit to a male-observed strip search and UA. The identity of John Doe 9 is not known at this time but as discovery is made available this individual will be identified and substituted for John Doe 9.

56.     John Doe 10 is a correctional DSU Lieutenant at TRCI who required Plaintiff to

submit to a male-observed strip search and UA. The identity of John Doe 10 is not known at this time but as discovery is made available this individual will be identified and substituted for John Doe 10.

57. John Doe 11 is a Correctional Officer at TRCI who placed Plaintiff in a cage in her soiled, wet clothing. The identity of John Doe 11 is not known at this time but as discovery is made available this individual will be identified and substituted for John Doe 11.

58. At all times relevant, Defendant's employees and supervisors, as their conduct is alleged herein, acted within the course and scope of their employment with the Defendant.

59. All defendants are sued in their individual capacity.

**FACTUAL ALLEGATIONS**

60. Plaintiff entered custody of the Defendant Oregon Department of Corrections August 21, 2014.

61. On or about November 2019, while housed OSCI, Plaintiff was strip-searched in front of male prisoner Lewis Crane by male Correctional Officer ("CO") Defendant Doe 1, by order of Defendant Alves.

62. On or about December 2019, Plaintiff was strip-searched by male CO Defendant Barth in an open area and in full view of male prisoners and staff.

63. On or about December 25, 2019, Plaintiff requested toilet paper from OSCI staff and was denied by Defendants Newell and Williams. Without toilet paper or other material for toilet hygiene, Plaintiff was forced to use her socks for personal hygiene after using the toilet, and to carry her feces-contaminated socks to laundry to dispose of them in a biohazard bag.

64. On or about January 31, 2020, while in the facility Maintenance Shop, Defendant Barth loudly referred to Plaintiff and other transgender individuals as "fucking trannies" within

view and earshot of other prisoners and staff in the Maintenance Shop.

65. On or about October 1, 2020, Defendant Parker made hostile and sexually suggestive comments about Plaintiff's genitalia, wondering aloud in front of other prisoners and staff whether Plaintiff had a penis. Defendant Parker further stated that he believed transgender individuals "are all BHS [Behavioral Health Services] cases," and refused to allow Plaintiff to work in the facility furniture shop based on her sex, gender, and gender identity.

66. On or about October 9, 2020, Plaintiff was physically attacked by prisoner A.H. in the OSP Dayroom in plain view of Defendant Doe 4 and OSP staff who ignored the verbal harassment and threats to Plaintiff's physical safety preceding Howard's physical attack against Plaintiff. Defendant Doe 4 and OSP staff further ignored the subsequent physical assault against Plaintiff by Howard. After first verbally harassing Plaintiff with transphobic comments and slurs referring to gender and sexual identity and making threats of violence toward Plaintiff within full view and earshot of OSP staff, Howard punched Plaintiff in the mouth, causing a cut lip, bleeding, bruising, pain, and humiliation.

67. When Plaintiff retreated from the area and attempted to leave the Dayroom, Howard hid in a hallway and attacked her again, punching her back, sides, and head and causing pain, bruising, bleeding, swelling, and fear.

68. Neither Defendant Doe 4 nor OSP staff intervened in either attack on Plaintiff by Howard.

69. On or about December 26, 2020, Plaintiff formally requested transfer to CCCF, the only women's prison in Oregon, as Plaintiff was a woman housed in a men's prison. Plaintiff's gender is listed as "Female" in ODOC records. Plaintiff has since made numerous requests to OSP staff, Defendant Breyman, and the ODOC Transgender and Intersex Committee

(TAIC)[1] to be moved to CCCF.

70.     Plaintiff has been approved to receive gender affirming care, including vulvoplasty, which will further place her at risk of assault while housed in a men's facility.

71.

72.     Plaintiff's move to CCCF was denied or delayed despite ongoing physical, sexual, and psychological harm to Plaintiff and she remained at OSP until September 2, 2021.

73.     Defendant Tryon has repeatedly refused to use female gender pronouns to refer to and address Plaintiff. On or about March 3, 2021, Defendant Tryon deliberately and maliciously misgendered Plaintiff. Plaintiff filed a grievance regarding Defendant Tryon's deliberate misgendering, which OSP found substantiated.

74.     Until May 2021, Plaintiff was forced to shower with male prisoners, subjecting her to verbal and physical harassment, sexual comments about her naked body, threats of sexual violence, and male prisoners openly and visibly masturbating while watching Plaintiff shower.

75.     On numerous occasions during her time in ODOC custody, Plaintiff has been called "faggot," "tranny," and other derogatory names by ODOC staff, and repeatedly misgendered by ODOC staff.

76.     Defendants' demeaning, cruel, violent treatment of Plaintiff because of her transgender status is ongoing.

77.     From approximately March 2020 until June 2021, Plaintiff was housed at OSP in a cell with prisoner M.S., who is currently serving an approximately 40-year sentence for multiple counts of, among other violent convictions, rape, and sexual assault against women.

---

[1] Upon information and belief, the Transgender and Intersex Committee reviews and makes housing placements for transgender (and other gender-nonconforming) prisoners.

78. Upon information and belief, M.S. has been involved in previous sexual assaults against transgender women while in custody at OSP, including a former cellmate.

79. Despite Plaintiff's vulnerability as a transgender woman, ODOC assigned her to be celled with a known violent sexual predator.

80. AIC M.S. forced Plaintiff to submit to a non-consensual "relationship" with him, which included frequent forced sexual activity, violence, psychological abuse, and threats of further harm. Plaintiff was afraid of M.S. if she refused, and also afraid that other prisoners would harm her if she angered M.S.

81. Between approximately March 2020 and June 2021, Plaintiff was sexually and physically assaulted by AIC M.S. regularly and often, sometimes daily.

82. As a result of the numerous and frequent sexual and physical assaults, Plaintiff has suffered physical injuries and emotional trauma.

83. Around December 2020, Plaintiff showed a note to Defendant Adamson, which was written to her by M.S. In the note, M.S. stated that he had only allowed Plaintiff to live in his cell for "one reason," alluding to the forced sexual "relationship" and that if she would not submit that Plaintiff would need to find another place to live. Defendant Adamson told Plaintiff that her only other option would be to move into an open cell on "main line" where she would be more vulnerable to attacks by other prisoners.

84. Despite her report of unwanted sexual activity to Defendant Adamson, Defendant Adamson took no action to protect Plaintiff from M.S.

85. In March 2021, M.S. attempted to violently force Plaintiff to submit to unwanted sexual activity and she had to physically fight him off.

86. On or about May 20, 2021, M.S. attempted to violently force Plaintiff to submit to

unwanted sexual activity and she had to physically fight him off. After she physically fought him off, M.S. told Plaintiff that if she refused to submit to his demands of sexual activity, then she had to move out of the cell.

87. On or about May 20, 2021, Plaintiff again reported to Defendant Adamson that M.S. was forcing her to have a non-consensual "relationship" with him in exchange for living in his cell and Defendant Adamson responded by telling Plaintiff that she "[would] get over it." Defendant Adamson did not take action to protect Plaintiff from M.S.

88. On or about July 2, 2021, Plaintiff filed a tort claim notice regarding Defendant Adamson and OSP's failure to protect her from the physical and sexual abuse by M.S., prompting OSP to commence a formal PREA investigation, including reporting Plaintiff's allegations to Oregon State Police.

89. Defendant confined M.S. to the Disciplinary Segregation Unit (DSU) when the PREA investigation began, but only a few days later, Defendant began allowing M.S. to leave DSU each day to attend his prison employment despite the risk to Plaintiff's safety and wellbeing.

90. Immediately after M.S. was allowed to begin leaving DSU during the active PREA investigation, Plaintiff began suffering harassment and threats by other prisoners for "snitching" and "being a rape rat." When she attempted to go to the chow hall, Plaintiff was approached by a group of prisoners who threatened Plaintiff with bodily harm if she returned to the chow hall because of her reporting the assaults by M.S.

91. On multiple occasions, Plaintiff encountered M.S. in the prison while he was allowed to leave DSU for work, causing her to be re-traumatized and experience fear, anxiety, and mental anguish.

92.     After Plaintiff reported the sexual assaults by M.S., ODOC/OSP staff failed to provide sexual assault counseling or proper confidential access to a PREA advocate as required. On two occasions, Plaintiff was given the opportunity to contact a PREA advocate but only with OSP staff in the room with her, preventing any confidentiality.

93.     On or about August 27, 2021, Plaintiff was assaulted and groped by AIC N.S. while on the OSP recreation yard. On multiple occasions during the prior year, Plaintiff had complained to OSP staff about AIC N.S.'s sexually assaultive and predatory behavior. Lieutenant Cynthia Porter advised Plaintiff that same night that she had appropriately investigated and confirmed Plaintiff's allegations with camera footage.

94.     On or about August 28, 2021, Defendant Snyder approached Plaintiff on the recreation yard and demanded to know what had happened between Plaintiff and AIC N.S. that had caused AIC N.S. to go into disciplinary segregation, in full view and earshot of multiple other prisoners, violating both Plaintiff's privacy and PREA confidentiality rules, as well as making Plaintiff more vulnerable to retaliation by other prisoners for reporting AIC N.S.'s behavior.

95.     After the assault by AIC N.S., ODOC/OSP staff failed to provide access to a PREA advocate as required.

96.     Plaintiff continues to suffer psychological trauma, anxiety, and mental anguish as a result of the physical, mental, and sexual abuse she has experienced while in ODOC custody.

97.     Though ODOC finally sent her to Coffee Creek Correctional Institution for a very short time, Plaintiff was thereafter transferred to TRCI by way of Snake River Correctional Institution.

98.     After Plaintiff was transferred to TRCI from Snake River Correctional Institution

(SRCI) in or around August 2022, TRCI Captain Defendant Boston told her that Captain King from SRCI had relayed to him that Plaintiff was only an "attention seeker" and a liar, and Defendant Boston told Plaintiff that he believed Captain King's assessment of her. When Plaintiff reported various issues to TRCI Captain Defendant Herron, such as abuse by the gang members running the unit and concerns for her safety, Defendant Herron repeatedly dismissed her concerns and implied that she was a liar and a troublemaker.

99. Plaintiff was housed in segregation until December 22, 2022. Prior to and throughout the month of December 2022, Plaintiff sent multiple kytes to TRCI staff, including Defendant Herron and Defendant Swart regarding her housing safety concerns and requesting that once she leave segregation, she be housed in a single cell or with another transgender female for her safety.

100. On December 8, 2022, Plaintiff wrote to Defendant Herron, "Please don't let me get housed in a situation where I get assaulted."

101. On December 17, 2022, Plaintiff wrote to housing officer Defendant Swart, "Please don't put me in danger…please try to house me safe."

102. On or about December 22, 2022, upon leaving segregation, Plaintiff was assigned to share a cell with AIC J.L., with whom she was not previously familiar.

103. Upon information and belief, Defendant Herron, Defendant Swart, and Defendant Doe 5 were directly responsible for Plaintiff's housing assignment with AIC J.L.

104. Almost immediately, AIC J.L. began sexually harassing Plaintiff, making comments about her body, refusing to leave or turn around when she changed her clothes, asking her for sexual favors, and making unwanted sexual advances toward her.

105. Plaintiff did not call the PREA hotline to report AIC J.L.'s behavior because she

had recently received a voicemail message instructing her to stop calling the PREA hotline for "institutional issues" after she had called to report sexual harassment previously.

106. On or about December 24, 2022, AIC J.L. began waking Plaintiff in the night by attempting to insert his finger into her rectum while she slept and referring to himself as "Dr. Jelly Finger" because he apparently lubricated his finger with petroleum jelly which he kept in his cell. He also told her, "You just need some of Dr. [J.L.]'s medicated meat roll."

107. AIC J.L. would also force his face into her clothed buttock and genital area while she slept, and she would often awake to him "sniffing" her through her clothing. During these encounters, he sometimes referred to her as "Evie" and "Evelyn." This happened repeatedly and nightly, despite Plaintiff's repeated rebuffing and requests for AIC J.L. to stop.

108. After AIC J.L. began attempting to digitally penetrate Plaintiff's rectum while she slept and sometimes succeeding, Plaintiff sent a move request to TRCI staff citing "transgender housing issues," whereby she requested to be housed with another transgender female, but the request was denied.

109. Staff refused to move Plaintiff or AIC J.L. to another cell and left Plaintiff in the same cell as AIC J.L. Upon information and belief, Defendants Herron, Swart, and Doe 5 were directly responsible for Plaintiff's housing assignment.

110. Plaintiff reported to staff on a daily basis that she did not feel safe and repeatedly begged to be moved to a different cell. Plaintiff reported to Defendant Holmes specifically that J.L. just treated her "like a sex toy." She also specifically requested a move from Defendant Olson. She does not know the names of the other staff members she spoke to, but she verbally requested a cell change daily.

111. In or around early January 2023, Plaintiff filled out a second housing change

request form, citing "PREA safety & security," as the reason for her request. As per the instructions on the form, Plaintiff obtained signatures from two separate staff members on the form after filling it out, prior to submitting the form for review. Both Defendant Holmes and Defendant Olson reviewed and signed the form after Plaintiff indicated on the form that her reason for requesting transfer was "PREA safety" but neither inquired with Plaintiff further, nor took any action to protect Plaintiff from AIC J.L.

112. Plaintiff repeatedly attempted to contact her attorneys while she was being abused by AIC J.L. and her concerns were ignored by TRCI staff but because she was housed on an active gang unit, gang members would not allow her to use the phones because she is transgender.

113. After Plaintiff first requested to move with a formal move slip and staff refused to intervene, AIC J.L.'s behavior ramped up in severity and frequency. He began asking Plaintiff to perform oral sex and manual stimulation on him and trying to force her to submit to anal sex.

114. AIC J.L. also continued attempting to digitally penetrate Plaintiff's rectum and forcing his face into her clothed buttocks and genitals while she slept. Plaintiff refused to participate in any sexual activity with AIC J.L. whatsoever and had to physically pull away from him when he attempted to force sexual activity on her.

115. On or about January 11, 2023, AIC J.L. told Plaintiff that he had just received his testosterone shot from medical. He grabbed Plaintiff and pushed her down onto the lower bunk, using her shirt wrapped tightly around her arms to pin her arms like a straitjacket. AIC J.L. yanked down her shorts to expose her bare buttocks while pushing her face down, and forcefully thrusted his erect penis into Plaintiff's rectum. Plaintiff managed to break free from AIC J.L.'s grip after a moment and pull away, but he grabbed her again and aggressively told her to

masturbate him. Plaintiff grasped his penis and immediately as she did, he ejaculated onto her shorts and leg.

116. As a result of the rape, Plaintiff experienced extreme physical pain, bleeding, and difficulty with bowel movements. She also suffered from and continues to suffer from depression, fear, anguish, shame, and trauma. She did not sleep for the following two days and has suffered from frequent nightmares ever since.

117. Plaintiff did not immediately report the rape to staff because she had already attempted to report his prior assaultive behavior. In response, staff said that she was simply a liar and attention seeker, and Plaintiff did not think staff would believe her. She also did not believe that calling the PREA hotline was an option, both because she had used the hotline to report sexually assaultive actions toward her in the past without any resulting protection, and because she had recently received a message from the PREA operators asking her to stop calling the hotline.

118. On or about January 12, 2023, AIC J.L. exposed his genitals to her and tried to force her to manually masturbate him.

119. On or about January 12, 2023, Plaintiff reported to Defendant Holmes that AIC J.L. was harming her and begged to be moved to another cell. When Defendant Holmes asked Plaintiff for specifics, Plaintiff told Defendant Holmes that she was afraid of being accused of lying and did not think anyone would believe her if she told. Plaintiff broke down crying while telling Defendant Holmes that nearly every cellmate she has ever had has tried to have sex with her or abused her in some way. Plaintiff begged Defendant Holmes to simply listen in on the intercom in the cell that Plaintiff and AIC J.L. shared to hear the types of advances AIC J.L. was making toward Plaintiff and the ways in which he was trying to force her into sexual activity.

Plaintiff thought that the only way staff would believe her after they repeatedly refused to take her complaints seriously and had implied that she was lying was for them to hear AIC J.L.'s comments and behaviors firsthand. Defendant Holmes told Plaintiff to return to her cell, which Plaintiff did.

120. Immediately upon Plaintiff's return to her cell at approximately 3:50 pm on January 12, 2023, she asked AIC J.L. "why did you have your dick out this morning?" hoping that Defendant Holmes or another staff member was listening into the intercom in the cell as she had begged them to do. AIC J.L. immediately made sexual advances toward Plaintiff. She told him to stop and leave her alone because he had really hurt her the day before and caused her "to shit five times already" that day, hoping that would turn him off and make AIC J.L. leave her alone. AIC J.L. suddenly advanced toward Plaintiff and grabbed her. He yanked down Plaintiff's pants and forced his face into her unclothed anal area, then began licking her anus and forcing his tongue into her anus. Plaintiff managed to pull away and she verbally admonished him to "stop licking [her] ass!" still believing that staff were listening to her intercom as she had begged. The light indicating "count time" suddenly came on and AIC J.L. stopped assaulting Plaintiff and released his grip on her.

121. Moments later, at approximately 4:00 pm, security staff entered the cell and removed AIC J.L., leaving Plaintiff alone in the cell. Plaintiff believed that AIC J.L. was removed because a member of ODOC security staff had listened to the intercom and heard him assaulting her, and so she waited for someone to return to speak with her about the assaults. After waiting for approximately two hours, no one came to speak with Plaintiff regarding the assaults, so Plaintiff spoke with another AIC and asked that individual to summon Defendant Holmes for her to speak with. When Defendant Holmes approached Plaintiff's cell, Plaintiff

asked Defendant Holmes if she or other staff had been listening to the intercom and heard what AIC J.L. had done to Plaintiff, but Defendant Holmes told Plaintiff that no one had listened to the intercom. Defendant Holmes explained that she had suspected something was wrong and asked for AIC J.L. to be removed, but that the timing of his removal right after sexually assaulting Plaintiff was coincidental.

122. Plaintiff reported to Defendant Holmes that AIC J.L. had just sexually assaulted her and left bodily fluid on and inside Plaintiff's body and requested to go to the hospital for a formal sexual assault examination. Defendant Holmes told Plaintiff to change from the clothing she was wearing into her sweats and to go to the "security ops" office, which Plaintiff did. After Plaintiff changed her clothes, she walked unescorted to security ops.

123. Defendant Kennedy met Plaintiff at the security ops entrance and took her into an office where he began to ask her questions about the assault. While interviewing her, Defendant Kennedy gestured toward Plaintiff and Plaintiff flinched reactively in fear and anxiety. Defendant Kennedy told Plaintiff that AIC J.L. was "a piece of shit" and that Plaintiff should have "never been celled with him."

124. After interviewing Plaintiff, Defendant Kennedy told Plaintiff needed to remove her "panties," for evidence. Defendant Kennedy then took Plaintiff to a staff bathroom and stood in the open bathroom doorway while she removed her underwear in front of him, and he put the underwear into a plastic bag which he took with him. Defendant Kennedy then took Plaintiff to the area outside the security ops offices and told her to wait there with another CO. Plaintiff repeatedly begged to go to the hospital for examination but she was ignored.

125. At around 8 pm, two male security staff, Defendant Kennedy and Defendant Adams took Plaintiff from the area outside the security ops offices to the "stripdown" area of the

Page 19 – FIRST AMENDED COMPLAINT

Disciplinary Segregation Unit ("DSU") where they told her to stand on a white paper sheet which was laid out on the floor. Plaintiff was tired from standing for so long and tried to sit down on the paper sheet. Almost immediately, one of the COs received a call and then relayed to Plaintiff that Defendant Washburn, their lieutenant, was watching the cameras and said Plaintiff had to stand up. Defendant Kennedy and Defendant Adams instructed Plaintiff to remove all her clothing and place it onto the sheet.

126. Despite being a legal female and reporting being the traumatized victim of violent sexual assaults, Plaintiff was forced to undress completely with only these two male COs present and apparently Defendant Washburn observing her via camera. Plaintiff removed her clothing and stood completely naked. While Plaintiff removed her clothing, Defendant Kennedy and Defendant Adams were complaining to one another that Defendant Washburn was rushing them and telling them that this "[didn't] matter" and to "hurry up."

127. Plaintiff informed Defendant Kennedy and Defendant Adams that she was wearing clean clothing because she had been instructed to change clothing just prior to leaving her cell, and that they should collect the clothing she was previously wearing, as well as the shorts containing AIC J.L.'s semen from when he had raped her the previous day, which were still in her cell. Defendant Kennedy told Plaintiff that they only intended to collect the clothing she had just removed for their investigation.

128. After Plaintiff removed all her clothing and stood naked in front of male staff, Defendant Kennedy gave her a change of clothing to don. Defendant Kennedy then walked Plaintiff to the prison medical clinic where medical staff asked Plaintiff if she was in physical pain. Plaintiff replied that at the moment she was much more concerned about the DNA on her body and reiterated that she wanted a sexual assault examination performed. TRCI Medical staff

informed Plaintiff that they did not perform DNA collection there.

129. After that, Defendant Kennedy escorted Plaintiff back toward her cell and on the way there he told her the PREA investigation was over at that time.

130. Upon hearing that she was being taken back to her cell, Plaintiff became upset and insisted on going to Medical for examination and collection of J.L.'s saliva. Defendant Kennedy left her in her unit but then another CO promptly told her that Defendant Kennedy had returned for her, and she was to meet him at the unit entrance, which she did.

131. Defendant Kennedy then took Plaintiff to Defendant Washburn's office. Defendant Washburn asked Plaintiff about what bodily fluids she had on her, and when she told him that AIC J.L. had licked her anal area and rammed his tongue into her anus, he said, "so which is it? You told Medical that he raped you but now you're saying that he licked your ass? You're changing your story."

132. Plaintiff tried to explain to Defendant Washburn that J.L. had assaulted her on multiple occasions and that he had both raped Plaintiff with his penis the day before and also penetrated Plaintiff with his tongue earlier that day. Plaintiff said that she had been repeatedly abused for the previous two weeks, and again begged for a sexual assault examination.

133. Defendant Washburn told Plaintiff repeatedly through their conversation that what she was reporting was "just [her] story." After she was interrogated in Defendant Washburn's office, Defendant Kennedy escorted her back to the security ops hallway and then told her she was going to an outside hospital.

134. At around 10 or 11 pm, Plaintiff was finally taken to the local hospital where hospital medical staff performed a sexual assault examination approximately seven hours after J.L. had forced his tongue into her anus and at least 36 hours after he had forced his penis into

her rectum and ejaculated onto her leg and clothing. Two male COs were immediately present while Plaintiff went through the invasive sexual assault examination process in their full view and earshot, and they talked and laughed casually while Plaintiff's genitals were swabbed and photographed.

135. At some point in the early morning hours of January 13, prison staff took Plaintiff from the hospital after the sexual assault exam was completed and returned her to the prison. Plaintiff was placed in a cell within the Disciplinary Segregation Unit with an observation camera and water controlled by staff outside the cell. Plaintiff showered knowing she was being watched while she washed off the bodily fluids her attacker had left on her. Because of Plaintiff's extreme anguish and distress, she did not sleep at all.

136. Around 9 am on January 13, Plaintiff was taken to an interview room at the prison to be interviewed by Oregon State Police Detective Amy Ford. At that point, Plaintiff had not slept in two days or had her hormonal medication for two days.

137. When Plaintiff returned to her cell at TRCI, she found that all her loose clothing and some of her shoes had been removed. When Plaintiff questioned Defendant Kennedy and Defendant Terry regarding getting her clothing back, Defendant Terry asked why Plaintiff cared so much about her clothing if she was "really" sexually assaulted.

138. Plaintiff has never been offered BHS services for the trauma of the sexual assaults. Plaintiff has never been offered PREA advocacy or counseling for sexual assaults.

139. On or about January 29, 2023, another AIC informed Plaintiff that J.L. had been released from Disciplinary Segregation a week prior and was now housed on a unit that went to the daily medication line at the same time as Plaintiff's unit.

140. Plaintiff became terrified of running into her abuser and she approached CO

Nelson and asked if J.L. was out of DSU. Another CO quickly walked up and said he was there as a witness "so that no false allegations get made up." CO Nelson told Plaintiff that Defendant Campos had given orders not to tell Plaintiff anything about J.L. or the investigation, so he could not confirm whether J.L. had been released from DSU.

141. J.L. was, in fact, released from DSU, attending the medication line and chow line at the same times as Plaintiff, forcing Plaintiff to risk crossing paths with the man who repeatedly sexually assaulted her, causing ongoing and daily fear, trauma, and re-victimization. On multiple occasions, other AICs warned Plaintiff that J.L. was in the chow hall or attending med line so she could avoid him. Plaintiff was terrified to even pick up food or medication because she might have run into the perpetrator who violently attacked her.

142. On or about January 31, 2023, Plaintiff contacted Superintendent Defendant Reyes in desperation to request that J.L. be moved to a unit where Plaintiff would not be at risk of seeing him. Defendant Herron responded to Plaintiff's written request stating that J.L. had been moved to a different unit than Plaintiff's but if she wanted further action taken, she could fill out a "conflict form" for review. After Plaintiff did, in fact, fill out a "conflict form," Defendant Archer sent a kyte back on or about March 8, 2023, stating "No, this has not been substantiated."

143. On March 13, 2023, Defendant Archer told Plaintiff that her request to be formally separated from her attacker did "not meet the need for a conflict" report to keep them separated. Yet, despite an active investigation, J.L. was allowed to leave DSU and remain at the same prison as Plaintiff on a unit that could place him in Plaintiff's path, and Plaintiff's request to be protected from her abuser—even temporarily—was denied.

144. On or about February 3, 2023, Plaintiff received a letter in the mail from J.L.,

mailed out from TRCI via U.S. Postal Service and postmarked on January 30, 2023. The envelope plainly indicated that it was being sent from J.L. to Plaintiff. It was not until after counsel for Plaintiff contacted DOJ regarding J.L.'s mail and his ability to contact Plaintiff that a "Mail Restriction" was implemented on February 22, 2023, to prevent J.L. from contacting Plaintiff.

145. During the months of April and May 2023, Plaintiff encountered J.L. on at least two occasions while attending the medication line—notwithstanding his cell assignment on a separate housing unit as Defendant Herron had indicated would protect Plaintiff from encountering her attacker—causing Plaintiff to experience extreme re-traumatization, fear, anxiety, and distress.

146. Upon information and belief, J.L. is currently serving an approximately 10-year sentence for five counts of First-Degree Sexual Abuse[2], for which he entered ODOC custody in November 2022.

147. J.L. remained housed in the same institution as Plaintiff until hearings began for Plaintiff's Temporary Restraining Order—*eight months* after the sexual assaults.

148. Despite the current litigation and an active Complaint for the same issue of ODOC housing Plaintiff with a known violent sex offender who predictably sexually assaulted her, ODOC still failed or refused to protect Plaintiff from further sexual victimization and celled her with yet another known violent sex offender.

149. Outside of her cell, Plaintiff is not any safer.

150. AIC W.D. continuously sexually harassed Plaintiff for the length of time he was housed on her unit. He would discuss his penis size, call Plaintiff a "slut," and extort Plaintiff for

___

[2] Multnomah County case number 20CR41414

Page 24 – FIRST AMENDED COMPLAINT

canteen and commissary items. On or about August 14, 2023, W.D. waited for Plaintiff after Medline and followed her down the corridor stating that she needs to "make him money by fucking niggers." Although the incident was documented by Defendant Holmes, the following day he started yelling at Plaintiff that she is a "fucking faggot and everybody hates faggots." Defendant Dean and Defendant Arvaldo were within earshot of the threats but did nothing.

151.     On or about August 30, 2023, Plaintiff was physically assaulted by AIC W.M. while she was taking her medications at Medline. Without warning, W.M. suddenly punched Plaintiff so hard she fell backwards and hit her head. W.M. repeatedly punched Plaintiff in the back of her head until she lost consciousness. When Plaintiff regained consciousness, she was lying on the ground and W.M. was standing over her calling her a "faggot."

152.     Upon information and belief, Defendant Doe 6 was in the immediate vicinity of the attack on Plaintiff and did not protect Plaintiff or intervene timely.

153.     Another AIC, J.E., intervened to pull W.M. from Plaintiff when ODOC staff failed to protect or rescue her from the brutal attack, and then W.M and another unknown AIC began attacking J.E.

154.     W.M. had to be pepper sprayed by a Medline nurse, whose name Plaintiff does not know, in order to finally be subdued. The pepper spray went onto Plaintiff, causing significant burning sensations and making her vomit.

155.     Immediately after the attack, Plaintiff was handcuffed along with the two assailants and J.E. who had come to Plaintiff's defense. Plaintiff was placed in DSU along with the two assailants and J.E. while staff reviewed video footage, even though the Medline nurse had told staff that Plaintiff was the victim.

156.     While in DSU, Plaintiff was initially only provided with a rag to wipe her face

and had to remove her shirt in front of male staff to have her injuries photographed.

157.     Despite being covered in pepper spray, Plaintiff was never offered the opportunity for a decontamination shower. She was finally allowed to take a shower only after begging a CO to allow her to wash the pepper spray covering her body.

158.     Defendant John Doe 7 failed to offer a decontamination shower or to provide any medical attention for Plaintiff's head injury prior to placing her into DSU or at any time after. At no time did any ODOC staff provide medical attention for Plaintiff's loss of consciousness and possible concussion or other brain injury.

159.     Upon information and belief, while Plaintiff was housed in DSU, W.M. openly admitted that he had targeted Plaintiff because of her gender identity, calling her a "tranny" and calling J.E. a "tranny lover" for trying to intervene to help Plaintiff.

160.     Approximately one week prior to the Medline attack by W.M., Plaintiff had submitted a kyte to Defendant Herron explaining that she was afraid of being assaulted in communal spaces. Neither Defendant Herron nor any other ODOC staff took steps to protect Plaintiff or address her concerns.

161.     After the Medline attack by W.M., Plaintiff requested that TRCI submit a conflict report to keep W.M. separated from Plaintiff. Defendant Doe 8 refused to implement a conflict report for Plaintiff reasoning that the attack did not cause Plaintiff "serious injury," notwithstanding her loss of consciousness and likely head injury.

162.     Plaintiff then submitted a conflict report herself, but no one from ODOC ever signed or processed the report. Plaintiff requested that the Medline attack against her by W.M. be reported to the Oregon State Police, which is required by Oregon state law for all bias crimes. TRCI staff and Defendant Herron refused to report the incident as a bias crime and both ODOC

and DOJ reasoned that the attack, whereby the assailant used slurs related to sexual orientation and gender identity and openly admitted that he had targeted Plaintiff because she is transgender, was not related to sexual orientation or gender identity.

163. On or about September 5, 2023, Plaintiff met with a Lieutenant whose name she does not know, to discuss PREA concerns, and that staff member told Plaintiff that TRCI could not keep her safe.

164. On November 13, 2023, at around 9 pm, TRCI officers came to Plaintiff's cell and handcuffed her, along with two others.

165. Upon information and belief, TRCI staff were conduction an investigation into the introduction of "spice paper" into the prison.

166. COs took Plaintiff to the Disciplinary Segregation Unit (DSU) and put her into a small cage in the corner, which was approximately 2.5 feet by 2.5 feet. There was barely enough room to stand or to sit on the floor. There were two other enclosures that were significantly larger, but they put her into the smallest one.

167. A CO (John Doe 9) told Plaintiff she would need to provide a urine sample for a urinalysis test (UA). He said Plaintiff was going to be given a cup of water every 30 minutes and she would have to give a sample within 2 hours.

168. Plaintiff began to panic because she knew that to provide a urine sample for a UA, a staff member would look directly at her genitals while she urinated. Plaintiff told the CO that the court in this case had issued an injunction to prevent her from being forced to expose her naked body to male AICs and staff members. She asked for a female staff member to conduct the UA.

169. The DSU Lieutenant (John Doe 10), came to the cage and said, "You need to

submit to a strip search and a UA. You are not on special search list in the computer. I checked with Captain Herron directly and he said you need to submit to the search and UA by male staff." He then told Plaintiff that TRCI does not even have female staff who are trained to conduct UAs, and that none of the female COs on shift were trained for unclothed searches.

170. Plaintiff began to cry and told them that there was a court order in place. Plaintiff said repeatedly that she was not refusing to submit to a search or a UA and would submit to both by a female staff member. Either Defendant Morby or the DSU Lieutenant (John Doe 10) replied, "Well, the security needs of the institution override your court order."

171. Plaintiff was becoming flustered because she was filled with panic and anxiety about men looking directly at her body and potentially judging her. She feels deeply self-conscious about her body in general because she is transgender, but it is even more intense with regard to her genitals and especially her breasts. Plaintiff kept repeating that she was not refusing a search or a UA and begged them to just have a female conduct them.

172. At some point, Defendants CO Erickson (female) and Holmes both walked by the cage, and Plaintiff begged them to do the searches. CO Erickson said, "No." Plaintiff said to CO Holmes, "Ms. Holmes please, you know how this is, please don't let them humiliate me." CO Holmes just ignored Plaintiff and kept walking.

173. The DSU Lieutenant (John Doe 10) walked away after a few minutes, and as he walked away, he told Plaintiff she could use the bathroom when she was ready to submit to a UA on their terms. Plaintiff told him she needed to urinate, but Defendant Doe 10 said Plaintiff could not leave her cage until she agreed to submit to a strip search and a UA.

174. Plaintiff's urge to urinate started to become very strong and she kept telling staff she had to use the bathroom. Plaintiff told them she really had to urinate badly and was about to

"pee" herself. When he said she could not use the bathroom unless she submitted to a UA, she told the DSU Lieutenant (John Doe 10), "What next, will you make me shit myself too?" He replied, "Well, AICs have pissed and shit themselves in there before, so do what you need to do." Plaintiff told him she did not want to do that, and that she just wanted to use the bathroom.

175. Finally, at approximately 10:00 p.m., Defendant Morby took Plaintiff out of the cage and escorted her to the bathroom, but apparently there was another AIC in the bathroom, so Defendant Morby put her back in the cage and refused to take her to another bathroom. Plaintiff could no longer hold her bladder and urinated on herself, partially saturating her clothing, including some on her shirt. Because she was wearing multiple layers of clothing and did not fully empty her bladder, the urine was absorbed into her clothing but did not run down onto the floor.

176. At approximately 10:10 p.m., Defendant Morby returned to Plaintiff's cage and escorted her back to the bathroom and allowed her to try and clean herself up. Plaintiff did her best to rinse the urine from her clothes because it seemed better to have clothing that was saturated with water than urine, but that also made her clothes wetter. After that, Defendant Morby took her back to the small cage and put her back inside with water- and urine-soaked clothing, and told her she was going to be in there all night because she had not submitted to the unclothed search by male staff.

177. Plaintiff's clothes were wet in the crotch area, and she was very uncomfortable and afraid to get some kind of infection from wearing wet clothes all night, since she could barely even sit with her body all scrunched up. Plaintiff took off the wet shirt and pants to try to air them out. She then knelt down on the floor in her bra and underwear, slumped over, and crying. Plaintiff felt humiliated about urinating in her pants and still wearing urine-soaked

Page 29 – FIRST AMENDED COMPLAINT

underwear. Plaintiff was ashamed, filled with anxiety and anguish, and broken.

178. A female CO believed to be Defendant Moon walked by. Plaintiff said to her, "I'm not going to have your male staff humiliate me" because Plaintiff thought a woman might understand. Plaintiff told her, "I have small breasts, I can't bear the thought of showing these men my breasts and my booty." Defendant Moon said, "Well, then you can stay in cage until you decide to do it," and walked away.

179. A few minutes later, Defendant Moon returned and told Plaintiff that she would do the strip search but that she was not trained in doing unclothed searches so Defendant Steffey would need to be there to walk her through the process. However, Defendant Moon left and returned a few minutes later and said, "Change of plans. I'm not able to do the search but I'll be there while Sgt. Steffey does it." Plaintiff asked if Defendant Moon would even just do the search on Plaintiff's top half because Plaintiff feels so sensitive about her breasts and afraid of what men will say about them. Defendant Moon told Plaintiff no, that Sgt. Steffey would do the whole strip search.

180. At approximately 11:55 p.m., Defendant Moon and Defendant Steffey came to the cage and made Plaintiff cuff up before she could even put her clothes back on. They walked Plaintiff in handcuffs in only her bra and urine-saturated underwear across the DSU main corridor, on full display for staff and AICs.

181. They took Plaintiff into the strip-search room. Plaintiff became somewhat hysterical because she was filled with shame and panic and felt humiliated anticipating Defendant Steffey looking at her naked body, especially her breasts. Plaintiff was crying and kept repeating, "Please don't judge my body."

182. Defendant Steffey made Plaintiff remove her bra and underwear. When Plaintiff

was naked, he told her to "lift and separate" but Plaintiff was confused and told him she did not understand what he was asking. He told Plaintiff, "Well *normal* males lift their package and separate their penis from their scrotum." Because of the female hormones Plaintiff takes, her genitals are contracted against and into her body, which is difficult to even discuss with others, let alone show them. Plaintiff told Defendant Steffey, "I can't do all that, there's nothing to lift and separate." Plaintiff felt acutely aware of her body and humiliated, as if she was on full display to have to show and discuss all her biggest flaws and insecurities all at once. Plaintiff was trying to do what he told her to do, though, so she grabbed her crotch and just moved her flesh under her hand as much as she could.

183. Plaintiff was crying so hard and trying to shield her breasts that Defendant Steffey eventually uncuffed one of her hands so she could put her bra back on. He then took her to a regular cell in DSU.

184. Defendants Steffey and Moon were both wearing gloves to handle Plaintiff's clothing, and because nearly two hours had elapsed since she lost control of her bladder and rinsed her clothes, her clothing was only damp.

185. That night, Plaintiff paced in her cell and felt consumed with hopelessness and despair.

186. The next day, Ms. Aguiar from Behavioral Health Services (BHS) came to Plaintiff's cell and Plaintiff told her what had happened the day before. Plaintiff was still distraught and could not stop crying. Plaintiff told Ms. Aguiar, "I think DOC is just always going to treat me like a man." Then Plaintiff crawled into her bunk in the fetal position and cried for hours.

187. On November 17, at about 8 am, Defendant Trott came to Plaintiff's cell. He told

Plaintiff she was in DSU because she had refused to submit to a UA. Plaintiff repeated to him that she had never refused a UA and was still not refusing to do one, but just needed it to be with a female. Plaintiff told him that she thought the court order was supposed to protect her from having to expose her naked body to male staff and AICs. Captain Trott said, "We're security and we override the court order." Plaintiff asked if she could do a UA for medical staff instead of a CO, and he said no.

188.     In DSU, where Plaintiff was housed for approximately 30 days, one of the showers is in full view of staff at the control point and part of both the top and bottom tiers where male AICs are housed. The control point windows are blacked out so Plaintiff could not even tell if anyone was looking at her or who was looking at her. The door had two large windows in addition to the cuff port, leaving her exposed. The other DSU showers she used had only a metal mesh door with a large window that left her naked body exposed. DSU staff also put inmate clothing outside the cuff port for the showers, which they leave open, so Plaintiff had to go right up to the door naked to get her clean clothing. Plaintiff directly saw at least one AIC peering in at her naked body.

189.     Defendant Morby issued to Plaintiff a major Misconduct Report ("DR") for Contraband I (a major rule violation) and Disobedience of an Order I (a major rule violation) for "willful and overt disobedience of an order directly challenging the authority of the staff member…" Defendant Hazen signed off on Defendant Morby's Misconduct Report and initiated Plaintiff's ongoing confinement to DSU because she refused to expose her genitals to male staff which evidently threatened the security of the facility, despite Plaintiff's repeated expression of willingness to submit to UA and strip search by female staff. The Misconduct Report explicitly notes Plaintiff's repeated statements that she was *not* unwilling to submit and merely requested a

female staff member to conduct the UA and strip search.

190. Though it charged her with Contraband I, the initial Misconduct Report does not allege any facts related to Plaintiff's use or involvement in any contraband whatsoever, apparently operating on a presumption of guilt for her refusal to submit to a UA by a male staff member.

191. After approximately 30 days in DSU, Plaintiff was released back to general population and the initial Misconduct Report was dismissed. However, she was then issued a new Misconduct Report accusing her of Contraband I, Distribution I, Racketeering, and Drug Possession. Though the report alleges generally that she aided in introducing drugs into the facility, it provides no details and makes no specific allegations whatsoever of how she allegedly aided in any misconduct.

192. Plaintiff is now facing significant loss of privileges, monetary fines, and extensive confinement to DSU as punishment for the Misconduct Report.

193. This experience has left Plaintiff dismayed, utterly humiliated, and degraded.

## COUNT I

**(42 U.S.C. § 1983 – 14th Amendment – Equal protection)**

**(Against Defendants Highberger, Kelly, Barth, Borden, Alves, Williams, Newell, Parker, Tryon, Breyman, Reyes, Boston, Trott, Steffey, Morby, Holmes, Erickson, Swart, Kennedy, Adams, Terry, Washburn, Herron, Moon, John Does 1-6, and John Does 8-11)**

190. Plaintiff re-alleges all relevant paragraphs as though fully restated herein.

191. As a result of Defendants' conduct as alleged above, Defendants violated Plaintiff's right to equal protection under the law under the Fourteenth Amendment of the United

States Constitution.

192.     Defendants Highberger, Reyes, and Kelly allowed discriminatory and abusive practices toward Plaintiff by staff based on Plaintiff's sex, gender, and gender identity.

193.     Defendants John Doe 2, John Doe 3, and John Doe 5 failed to properly identify and classify Plaintiff as a Vulnerable AIC and forced her, a transgender female, to be housed in men's prisons where she would foreseeably be subjected to abuse and discrimination.

194.     Defendants Barth, Border, Alves, Williams, Kennedy, Adams, Newell, Parker, Tryon, Boston, Terry, Trott, Steffey, Herron, Morby, Erickson, Holmes, Moon, John Doe 1, John Doe 4, John Does 9-11 treated Plaintiff in a manner that was discriminatory and abusive because of her sex, gender, and gender identity, and knowingly permitted or encouraged subordinates to do so.

195.     Defendant Breyman failed to properly transfer Plaintiff to a women's prison despite documented abuse at OSP because of her sex, gender, and gender identity.

196.     Defendant Herron failed to address Plaintiff's concerns of being attacked because of her sex, gender, and gender identity.

197.     Defendants Herron, Trott, Steffey, and John Doe 10 forced Plaintiff into a small cage or submit, in violation of a court order, to being strip searched and observed while urinating by male officers. These officers left plaintiff in a cage, causing her to urinate on herself and her clothes. She was left in the cage for a long period of time while her clothes were soaked with her own urine and then paraded before the unit in her urine-soaked underwear.

198.     Defendant Herron and Trott placed Plaintiff in DSU where she can, in violation of a court order, be observed in the nude while changing or using the toilet.

199.     Defendants Reyes, Herron, and Swart failed to address Plaintiff's concerns of

being attacked and celled unsafely because of her sex, gender, and gender identity.

200. Defendant Herron failed to properly report the attack against Plaintiff as a bias crime because of her sex, gender, and gender identity.

201. Defendants Kennedy, Adams, and Washburn failed to properly respond to Plaintiff's report of sexual assault because of her sex, gender, and gender identity.

202. Defendants Campos, Herron, Reyes, Archer, and Doe 8 failed to properly respond to Plaintiff's requests to keep her attackers separate from her because of her sex, gender, and gender identity.

203. As a result of the Defendants' violation of Plaintiff's Constitutional rights, Plaintiff suffered contusions, a split lip, as well as severe physical and mental pain and suffering from Defendants' abusive and discriminatory behavior at OSCI and OSP.

204. As a result of the Defendants' violation of Plaintiff's Constitutional rights, Plaintiff suffered contusions, head trauma, loss of property, as well as severe physical and mental pain and suffering from Defendants' abusive and discriminatory behavior at TRCI.

205. The Fourteenth Amendment to the United States Constitution, enforceable under 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

206. The individually named Defendants' conduct exposed Plaintiff to violence and discrimination because of sex without protection in violation of her Fourteenth Amendment rights.

207. The individually named defendants acted with deliberate indifference to Plaintiff's constitutional rights. As a result of defendants' conduct, Plaintiff suffered economic harm, physical pain, injuries, and emotional distress.

208. Plaintiff is entitled to damages to compensate her for these injuries. Plaintiff has no plain, adequate or complete remedy at law to redress the wrongs described herein. Plaintiff has been and will continue to be irreparably injured by the conduct of the defendants unless the Court grants the declaratory and injunctive relief which she seeks.

209. Defendants' acts were willful and malicious and done with reckless indifference to Plaintiff's protected rights. Defendants should be assessed punitive damages in an amount as fixed by a jury to punish them and to deter such conduct in the future.

210. Plaintiff is entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT II

### (42 U.S.C. §1983 – Eighth Amendment)

**(Against Defendants Highberger, Kelly, Reyes, Adamson, Tooley, Snyder, Breyman, Herron, Swart, Kennedy, Adams, Olson, Holmes, Campos, Archer, Dean, Arvaldo, Morby, Steffey, Trott, Erickson, Moon, John Does 2-6, and John Does 8-11)**

211. Plaintiff re-alleges all relevant paragraphs as though fully restated herein.

212. Plaintiff is entitled to the full protection of the laws including the Prison Litigation Reform Act and the Prison Rape Elimination Act which requires ODOC and defendants to comply with the laws in providing protection from assault including physical assaults and rape, providing protection to vulnerable prisoners, and to comply with all aspects of intervening and providing a safe environment to Plaintiff.

213. Defendants violated the Constitutional and statutory rights held by Plaintiff in the following ways:

    a. Defendant John Doe 2 failed to provide adequate screening and risk evaluation of Plaintiff upon her entry into ODOC custody;

Page 36 – FIRST AMENDED COMPLAINT

b.        Defendants John Doe 2, John Doe 3, John Doe 5, Highberger, Kelly, and Reyes failed to provide adequate screening and risk evaluation of Plaintiff upon her admission to Oregon State Correctional Institution, Oregon State Penitentiary, and Two Rivers Correctional Institution;

c.        Defendants Kelly, John Doe 3, John Doe 5, John Doe 6, John Doe 8, Herron, Swart, Holmes, Olson, Kennedy, Adams, Washburn, Campos, Archer, Arvaldo, Dean, Adamson, Tooley, and Breyman failed to properly house Plaintiff to avoid contact with aggressive prisoners, and failed to properly protect Plaintiff from aggressive prisoners such as AICs A.H., M.S., N.S., J.L., W.D., and W.M.;

d.        Defendant Doe 4 failed to intervene when Plaintiff was attacked by A.H.;

e.        Defendant Doe 6 failed to intervene when Plaintiff was attacked by W.M.;

f.        Defendants Holmes, Dean, and Arvaldo failed to intervene when Plaintiff was threatened extorted, and sexually harassed by W.D.;

g.        Defendants Kelly, Adamson, and Tooley failed to provide and ensure a safe shower environment for Plaintiff;

h.        Defendants Kelly, John Doe 3, Adamson, and Tooley failed to properly house M.S. by allowing him access to vulnerable prisoners and female prisoners, failing to address M.S.'s historical aggressive predatory sexual practices and not properly segregating M.S. from vulnerable inmates;

i.        Defendants Kelly, John Doe 3, Adamson, and Tooley allowed M.S. to be housed with Plaintiff despite M.S. long-standing, well-documented

history of sexual predation and predatory sexual practices both outside and inside prison;

j.      Defendants Adamson and Tooley refused to address Plaintiff's complaints of abuse by M.S. on at least two occasions;

k.      Defendants Kelly, Adamson, and Tooley allowed M.S. to leave DSU during an active PREA investigation where he could further terrorize Plaintiff and spread word of her allegations to other prisoners at OSP, foreseeably risking her safety and wellbeing;

l.      Defendant Snyder openly discussed Plaintiff's PREA allegations in front of other prisoners and staff in a retaliatory manner; and

m.      Defendant Breyman repeatedly failed or refused to transfer Plaintiff to a women's prison despite Plaintiff's multiple requests and documented ongoing and repeated abuse and sexual assault because of Plaintiff's gender.

n.      Defendants Reyes, Herron, and Swart failed to properly house J.L. by allowing him access to vulnerable prisoners and female prisoners and not properly segregating J.L. from vulnerable inmates;

o.      Defendants Reyes, Herron, and Swart failed to properly house W.M. by allowing him access to vulnerable prisoners and not properly segregating W.M from vulnerable inmates;

p.      Defendants Reyes, Herron, Swart, Holmes, Dean, and Arvaldo failed to properly house W.D. by allowing him access to vulnerable prisoners and not properly segregating W.D. from vulnerable inmates;

q.      Defendants Archer, Reyes, Herron, and Doe 8 failed to implement

appropriate conflict reports to keep Plaintiff to protect her from her attackers.

r.     Defendants Herron, Trott, Steffey, Morby, Erickson, Holmes, Moon, and John Does 9-11 forced Plaintiff into a cage or submit, in violation of a court order, to being strip searched and observed while urinating by male officers. These officers left plaintiff in a cage, causing her to urinate on herself and her clothes. She was left in the cage for a long period of time while her clothes were soaked with her own urine and then paraded before the unit in her urine-soaked underwear.

s.     Defendant Herron and Trott placed Plaintiff in DSU where she can, in violation of a court order, be observed in the nude while changing or using the toilet.

214.    The individually named defendants acted with deliberate indifference to Plaintiff's constitutional rights. As a result of defendants' conduct, Plaintiff suffered economic harm, physical pain, injuries, and emotional distress.

215.    Plaintiff is entitled to damages to compensate her for these injuries.

216.    Defendants' acts were willful and malicious and done with reckless indifference to Plaintiff's protected rights. Defendants should be assessed punitive damages in an amount as fixed by a jury to punish them and to deter such conduct in the future.

217.    Plaintiff is entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988.

## **COUNT III**

**(42 U.S.C. §1983 – Eighth Amendment – Delay and Denial of Essential Medical Care)**

**(Against Defendants ODOC, Kelly, Reyes, Adamson, Tooley, Rhoades, and Doe 7)**

218.    Plaintiff realleges all previous paragraphs as if more fully set forth herein.

219.     Plaintiff is entitled to timely and adequate medical/psychological care as part of her Constitutionally guaranteed conditions of confinement pursuant to the 8th Amendment to the United States Constitution. Failure to provide timely and adequate medical care is a violation of the 8th Amendment prohibitions against cruel and unusual punishment. Furthermore, the PREA defines additional mandates for treatment after a sexual assault which is guaranteed to each prisoner.

220.     Plaintiff was denied psychological treatment, counseling, and mental health care as required by state and federal law following her reported rapes and sexual assaults.

221.     Plaintiff is entitled to timely unimpeded access to appropriate mental health evaluation, mental health evaluation including suicide risks, and mental health services follow-up as needed pursuant to federal and state law and the 8th Amendment to the United States Constitution.

222.     Defendants Kelly, Adamson, Tooley, and Rhoades denied Plaintiff mental health evaluations, mental health treatment, confidential access to PREA advocates, and any and all follow-up to address her psychological trauma resulting from the rapes, physical assaults, and psychological abuse and as required by law.

223.     As a result of the failures by defendants herein, Plaintiff suffered ongoing psychological trauma as she was denied treatment she required. Her psychological condition has deteriorated and been exacerbated by the numerous failures of defendants here.

224.     Defendants Reyes and Doe 7 denied Plaintiff appropriate decontamination after she was pepper sprayed during the Medline attack and failed to provide or ensure adequate medical care for her head injury.

225.     As a result of the failures by defendants herein, Plaintiff suffered ongoing medical

harm, pain, and possibly irreversible effects of an untreated head injury.

226. The individually named defendants acted with deliberate indifference to Plaintiff's constitutional rights. As a result of defendants' conduct, Plaintiff suffered economic harm, physical pain, injuries, and emotional distress.

227. Plaintiff is entitled to damages to compensate her for these injuries.

228. Defendants' acts were willful and malicious and done with reckless indifference to Plaintiff's protected rights. Defendants should be assessed punitive damages in an amount as fixed by a jury to punish them and to deter such conduct in the future.

229. Plaintiff is entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT IV

### (42 U.S.C. §1983 – First Amendment – Retaliation)

**(Against Defendants ODOC, Reyes, Kennedy, Campos, Adams, Washburn, Terry, Herron, Archer, Morby, Erickson, Holmes, Steffey, Trott, Hazen, Moon, and John Does 9-11)**

230. Plaintiff re-alleges all previous paragraphs as if fully stated herein.

231. The First Amendment to the U.S. Constitution applies to the States through the Fourteenth Amendment. The First Amendment prohibits retaliation against inmates by staff because the inmate has engaged in protected activity, such as filing grievances and invoking legal rights.

232. By taking and allowing the actions described above, Defendants intentionally violated Plaintiff's rights to be free from retaliation for engaging in First Amendment protected activity.

233. Defendant Herron failed to address Plaintiff's concerns of being attacked in retaliation for her protected activity of reporting sexual assault and filing grievances.

234. Defendants Reyes, Herron, and Swart failed to address Plaintiff's concerns of being attacked and celled unsafely in retaliation for her protected activity of reporting sexual assault and filing grievances.

235. Defendant Herron failed to properly report the attack against Plaintiff as a bias crime in retaliation for her protected activity of reporting sexual assault and filing grievances.

236. Defendants Kennedy, Adams, and Washburn failed to properly respond to Plaintiff's report of sexual assault and subjected her to a humiliating and dehumanizing strip search in retaliation for in retaliation for her protected activity of reporting sexual assault, requesting a sexual assault examination, and demanding that ODOC investigate properly.

237. Defendants Terry and Kennedy deliberately confiscated all Plaintiff's clothing in excess of what was necessary in retaliation for her protected activity of reporting sexual assault, requesting a sexual assault examination, and demanding that ODOC investigate properly.

238. Defendants Campos, Herron, Reyes, Archer, and Doe 8 failed to properly respond to Plaintiff's requests to keep her attackers separate from her in retaliation for her protected activity of reporting sexual assault and filing grievances.

239. Defendants Herron, Trott, Steffey, Moon, and John Doe 10 forced Plaintiff into a small cage to submit, in violation of a court order, to being strip searched and observed while urinating by male officers. These officers left Plaintiff in a cage, causing her to urinate on herself and her clothes. She was left in the cage for a long period of time while her clothes were soaked with her own urine. These actions were taken in retaliation for in retaliation for her protected activity of reporting sexual assault and filing grievances, in addition to her filing a motion for TRO and preliminary injunction.

240. Defendant John Doe 11 forced Plaintiff into a cage in her wet, soiled clothing

intending to leave her there all night, in retaliation for her protected activity of reporting sexual assault, filing grievances, and filing a motion for TRO and preliminary injunction.

241. Defendants Steffey and Moon forced Plaintiff to walk through the DSU corridor in only her bra and urine-soaked underwear, in full view of male staff and inmates, and then Defendant Steffey conducted a humiliating opposite-gender strip-search on Plaintiff while Defendant Moon stood by, in retaliation for her protected activity of reporting sexual assault, filing grievances, and filing a motion for TRO and preliminary injunction.

242. Defendants Reyes, Herron, and Trott placed Plaintiff in DSU where she can, in violation of a court order, be observed in the nude while showering, changing, or using the toilet, in retaliation for her protected activity of reporting sexual assault and filing grievances, in addition to her filing a motion for TRO and preliminary injunction.

243. Defendant John Doe 9 demanded that Plaintiff submit to a UA by male staff in retaliation for her protected activity of filing a motion for TRO and preliminary injunction.

244. Defendants Morby and John Doe 10 demanded that Plaintiff submit to a UA and strip search by male staff, and refused to allow her to use the bathroom until she urinated on herself, in retaliation for her protected activity of filing a motion for TRO and preliminary injunction.

245. Defendants Erickson and Holmes refused to conduct the same-gender UA and strip search of Plaintiff and left Plaintiff in a cage, in retaliation for her protected activity of reporting sexual assault, filing grievances, and filing a motion for TRO and preliminary injunction.

246. Defendant Trott refused to allow Plaintiff to have a UA conducted by medical staff, and admitted to willingly violating the court order protecting her from opposite-gender

viewing of her naked body, in retaliation for her protected activity of reporting sexual assault, filing grievances, and filing a motion for TRO and preliminary injunction.

247.     Defendants Reyes, Morby, and Hazen engaged in disciplinary action against Plaintiff in response for her requests to have a female staff member conduct her strip search and UA and informing staff of the court order, in retaliation for Plaintiff's protected activity of reporting sexual assault, filing grievances, and filing a motion for TRO and preliminary injunction.

**COUNT V**

**(Negligence)**

**(against ODOC)**

248.     Plaintiff re-alleges all previous relevant paragraphs as if fully stated herein.

249.     Defendants knew or should have known that AICs A.H., M.S., N.S., J.L., W.D, and W.M. presented a substantial risk to Plaintiff's safety. Because of ODOC's failure to protect Plaintiff, she suffered physical harm and severe physical and mental pain and suffering.

250.     ODOC failed to use reasonable care in housing Plaintiff and protecting her from physical and sexual assaults by other prisoners because of her sex and gender as alleged above. ODOC's conduct was negligent.

251.     Defendant ODOC owes Plaintiff a higher standard of care because of the nature of incarceration. As wards of the State, Defendant ODOC manages all aspects of Plaintiff's daily life and decides with whom she will interact, where he will work, live, sleep, bathe, use the toilet, recreate, etc. Had Plaintiff been a free person, she would have been able to avoid AICs A.H., M.S., N.S., J.L., W.D., and W.M. But as an incarcerated person, defendant ODOC prevented Plaintiff from being able to take these measures.

252. Defendant ODOC voluntarily took the custody of Plaintiff under circumstances such as to deprive her of normal opportunities for protection and created a non-delegable duty to ensure that Plaintiff was safe from violence and discrimination because of sex at the hands of other inmates. Defendants failed to meet their obligation to protect Plaintiff from known, obvious and predictable threats to her safety.

253. ODOC's conduct was unreasonable considering the risk of harm to Plaintiff. ODOC controlled all aspects of Plaintiff's life. Plaintiff's harms could have easily been prevented if OSP staff had intervened when A.H. began making derogatory comments about Plaintiff and threatening to attack her; if Plaintiff was not housed with M.S. or J.L.; if OSP staff had intervened when Plaintiff complained about M.S.'s assaults; if TRCI staff had intervened when J.L. began sexually harassing and assaulting Plaintiff; if TRCI staff had intervened when AIC W.D. openly sexually harassed, threatened, and extorted Plaintiff; if TRCI staff had taken Plaintiff's safety concerns about Medline seriously; and if defendants had not placed a female prisoner in a men's prison without sufficient supervision and protection. This was unreasonable.

254. As a direct and proximate result of ODOC's negligence, Plaintiff suffered economic harm, physical pain, injuries, and emotional distress. Plaintiff should be fully and fairly compensated for her damages in a sum that is just as determined by a jury.

255. Plaintiff satisfied the Oregon Tort Claims Act notice requirement by filing Tort Claim notices in December 2020 and July 2021.

256. Plaintiff is entitled to a prevailing party fee, her costs, and disbursements.

/ / /

/ / /

/ / /

## COUNT VI

### (Intentional Infliction of Emotional Distress)

### (against ODOC)

257. Plaintiff re-alleges all previous relevant paragraphs as if fully stated herein.

258. Defendant's employees and agents acted in the regular course and scope of their assigned job duties.

259. Defendant, in engaging in acts against Plaintiff in violation of orders of restraint, intended to cause Plaintiff severe emotional distress, or emotional distress was substantially certain to result from Defendant's conduct.

260. Defendant's acts consisted of an extraordinary transgression of the bounds of socially tolerable conduct.

261. Defendant's acts caused Plaintiff severe emotional and mental distress.

262. Defendant forced Plaintiff to submit to a deliberately invasive, hostile, and humiliating strip search after she reported sexual assault.

263. Defendant ignored Plaintiff's pleas to keep her safe and protect her from encountering past and future attackers, but Defendant refused and caused Plaintiff to suffer encounters with previous attackers and suffer severe physical attacks.

264. Defendant placed Plaintiff into disciplinary housing where she could be viewed naked by male staff and inmates while dressing, using the toilet, and showering.

265. Defendant forced Plaintiff to remain in a small cage until she urinated on herself after she stated she would only submit to a UA by a female staff member. Defendant then forced Plaintiff to walk across the DSU corridor in view of male staff and inmates in only her bra and urine-soaked underwear.

266. Defendant subjected Plaintiff to a dehumanizing and humiliating opposite-gender strip search where she was mocked regarding the appearance of her genitals.

267. Defendant refused to allow Plaintiff to undergo a same-gender search and UA despite Plaintiff's legal status as a female and a court order proscribing Plaintiff from being viewed by male staff and inmates.

268. Defendant then disciplined Plaintiff for begging to have a female conduct the UA and strip search.

269. Defendant's staff repeatedly informed Plaintiff that as security staff, they could override the court order intended to protect her.

270. As a result of Defendant's acts against Plaintiff, which were an extraordinary transgression of the bounds of socially tolerable conduct, and intended to cause Plaintiff severe emotional distress, Plaintiff suffered and continues to suffer severe emotional and mental distress, including depression, anxiety, ongoing trauma, terror, humiliation, anguish, and shame.

271. As a result of Defendant's acts, Plaintiff suffered injuries and damages as alleged above, which are realleged and incorporated by reference herein.

272. Plaintiff should be fully and fairly compensated for her damages in a sum that is just as determined by a jury.

273. Plaintiff is entitled to a prevailing party fee, her costs, and disbursements.

## **PRAYER FOR RELIEF**

Plaintiff prays for the following judgment against Defendants:

A.      A sum which will fully compensate Plaintiff for her physical pain and suffering;

B.      A sum which will compensate plaintiff for her emotional distress;

C.     A sum which will fully compensate plaintiff for her economic losses;

D.     An award of punitive damages;

E.     For reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

F.     Equitable relief; and

G.     For such other and further relief as the Court may deem just and equitable.

**Plaintiff demands a trial by Jury.**

Dated: December 20, 2023

LAW OFFICES OF DANIEL SNYDER

/s/ John Burgess
John Burgess, OSB No. 106498
johnburgess@lawofficeofdanielsnyder.com
Katharine Edwards, OSB No. 173393
attorney@kedwards-law.com
Of Attorneys for Plaintiff